IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROLE GUERRA, individually and on behalf of all those similarly situated, | : : : | Case No. _____ |
| Plaintiff, | : | |
| v. | : : | |
| HEARTLAND EMPLOYMENT SERVICES, LLC, an Ohio limited liability company, | : : : | JURY TRIAL DEMANDED |
| Defendant. | : : | |

## COLLECTIVE ACTION COMPLAINT

Carole Guerra ("Plaintiff"), through her undersigned attorneys, makes the following allegations against Heartland Employment Services, LLC, ("Defendant"), concerning its acts and status upon actual knowledge and concerning all other matters upon information, belief, and the investigation of her counsel:

### NATURE OF THE ACTION

1. Beginning January 1, 2012, Defendant's parent corporation, HCR ManorCare, Inc. ("Manor Care"), implemented new Professional Appearance and Dress Code Guidelines ("Professional Appearance and Dress Code") that were intended to standardize the uniforms and dress codes used in Manor Care's 291 skilled nursing facilities. This case seeks to recover for the uncompensated uniform maintenance work that Manor Care's nursing staff performed without pay under this new Professional Appearance and Dress Code policy.

2. Among other things, Plaintiff contends that Defendant violated the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), by knowingly suffering or permitting employees within the Nursing Department of its skilled nursing facilities to spend more than a *de minimis* amount of "off-the-clock" time complying with the Professional

Appearance and Dress Code policy without proper compensation. Plaintiff seeks to bring her claim for violation of the FLSA as a multi-state collective action under 29 U.S.C. § 216(b).

3. This action is substantively related to E.D. Pa. Case No. 12-cv-04395, which is based on similar facts and alleges similar claims against Defendant for the period ending December 31, 2011.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's FLSA claim pursuant to 29 U.S.C. §216(b), 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. §1332(a)(1) (diversity jurisdiction), because the matter in controversy in this civil action exceeds $75,000.00 exclusive of interest and costs and because the parties are residents of different states.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b) because Plaintiff resides in this District, worked for Defendant in this District and suffered the losses at issue in this District, and because Defendant has significant business contacts within this District and the actions and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

6. Plaintiff Carole Guerra is an adult citizen of the Commonwealth of Pennsylvania who resides in Philadelphia County, Pennsylvania. From July 18, 2004 to January 31, 2013, Ms. Guerra worked as a full-time, non-exempt Certified Nursing Assistant (CNA) at Manor Care in Devon, Pennsylvania. As part of her job, Ms. Guerra had to comply with a Professional Appearance and Dress Code policy that required her to show up for work each day in a clean, wrinkle-free uniform. At all times relevant, Ms. Guerra was employed by Defendant, the human resources division of Manor Care. Ms. Guerra's executed consent to sue form is attached hereto as Exhibit A.

7. Defendant Heartland Employment Services, LLC is a wholly-owned subsidiary of HCR ManorCare, HCR Healthcare and/or LLC and Manor Care, Inc. (collectively, "Manor Care") and has its corporate headquarters in Toledo, Ohio. During the relevant period, Heartland has owned, controlled and managed a network of 291 Manor Care skilled nursing facilities in 27 states, including about 40 skilled nursing facilities in Pennsylvania. *See http://www.hcr-manorcare.com/find-a-location/* (visited Dec. 2, 2014). Defendant owns and/or controls the skilled nursing facilities at issue, directly employs all Nursing Department employees at Manor Care facilities and has responsibility for enforcing the patient safety, infection control and Professional Appearance and Dress Code policies at issue here.

## MATERIAL FACTS

### A. The Importance of Clean Uniforms in a Healthcare Setting.

8. Employment in a healthcare setting involves unique issues stemming from the need to maintain an environment in which people with compromised immune systems and an array of medical problems can heal.

9. Many employees in a healthcare setting – including Nursing Department employees – perform duties that regularly put them into direct contact with patients' bodily fluids and an array of infectious pathogens.

10. When such contact occurs, infectious pathogens can not only contaminate and survive on healthcare worker uniforms but, if left untreated, can rapidly multiply and transmit infection from the contaminated uniform to patients, visitors, co-workers and other surfaces in the facility.

11.     For this reason, and others, Defendant placed the highest priority on patient safety and infection control throughout all Manor Care facilities and, as a result, paid very careful attention both to the uniforms their employees wore and how these uniforms were maintained.

      **B.**     **Defendant Adopted a New, Mandatory Professional Appearance and Dress Code Policy for All of Manor Care's Skilled Nursing Facilities Effective December 31, 2011.**

12.     On September 30, 2009, Defendant rolled out a new mandatory Professional Appearance and Dress Code Policy across all Manor Care skilled nursing facilities. *See* Exhibit B (D 190-225). This initiative had the goal of replacing the current, facility-specific dress codes in place at each Manor Care skilled nursing facility with a common Professional Appearance and Dress Code. *Id.* at D 191.

13.     While the title of the new Professional Appearance and Dress Code included the word "guideline," the policies it contained were neither optional nor a mere recommendation. The e-mail (D 190-192) and implementation presentation (D 206-223) that accompanied the new policy explained that compliance with the new policy was indeed mandatory, but that it was being presented and implemented to minimize surprise, distraction and expense since the key changes were scheduled to occur during a time when most people were still trying to recover from a severe economic recession. *See* Exhibit B.

14.     The new Professional Appearance and Dress Code policy, effective December 31, 2011, contained many statements emphasizing the link between patient safety, infection control and maintaining a properly cleaned and finished uniform, including:

- The way we dress plays an important role in caring for patients. It helps us stay safe and infection-free…

- Employees must keep uniforms clean and in good repair. In general, uniforms must appear wrinkle-free…

4

- You must adhere to standards of cleanliness, grooming and hygiene and must wear appropriate professional attire during working hours and at any other times while representing HCR ManorCare.

- By appearing professional, we can show anyone who walks through the door that we're a proven leader at what we do: providing quality skilled nursing and rehabilitative care in a caring environment.

- Maintaining a safe work environment is everyone's responsibility and it is required by law.

- We expect you to... follow rules of personal hygiene, infection control and safety at all times.

*Id.* at D 191, 196, 199, 209, 212.

15.  As the implementing materials explain, the new Professional Appearance and Dress Code policy was needed and adopted for a variety of reasons, each of which inured to the benefit of Defendant, including to: convey the professionalism and competence of their employees, foster the important goals of patient safety and infection control, increase patient satisfaction with Defendant's services, minimize work days lost to illness, avoid increased costs associated with replacement workers, avoid the costs associated with providing uniform cleaning services and encourage unity and camaraderie among their employees. *Id.*

16.  Moving to a standard Professional Appearance and Dress Code policy in all skilled nursing facilities was also important to support Defendant's operational activities. Maintaining a common Professional Appearance and Dress Code policy across all of its skilled nursing facilities helped to ensure that all Nursing Department employees would follow the same high standards for dress and appearance and foster the key goals of patient safety and infection control. *Id.*

### C. Defendant Selected the Uniform and Uniform Vendor and Threatened to Discipline Employees who Failed to Comply with the new Professional Appearance and Dress Code Policy.

17. Beginning December 31, 2011, Defendant's new Professional Appearance and Dress Code policy required Plaintiff and the collective group members to wear a uniform consisting of uniform scrubs purchased from Encompass Textiles in a proscribed color palate to be determined by location management. *Id.* at D 191, 195, 199, 212, 218-219. The Professional Appearance and Dress Code policy also identified a uniform scrub jacket and white lab coat as optional attire for certain nursing positions. *Id.*

18. Defendant's designation of Encompass Textiles as the only approved uniform vendor and their insistence that all employee uniforms be purchased through Encompass after December 31, 2011, deprived Plaintiff and the collective group members of the ability to substitute other uniform garments that might have required less time or effort to maintain.

19. Plaintiff and the collective group members occasionally wore protective apparel that was permeable and/or did not cover their entire bodies, which allowed their uniforms to become contaminated with infectious pathogens. Further, regardless of whether Plaintiff and the collective group members used protective apparel, doing so did not excuse them from the requirement of showing up for each shift in a clean, wrinkle-free uniform. *Id.* at D 191, 196, 199, 209, 212.

20. To further encourage Plaintiff and the collective group members to comply with the requirement of wearing a clean, wrinkle-free uniform to work each day, Defendant could send employees home without pay to change clothes if needed and could subject employees to progressive discipline, up to and including termination, for failing to comply with the Professional Appearance and Dress Code policy. *Id.* at D 193, 196.

6

21.     During the relevant period, Defendant required Plaintiff and the collective group members to comply with all of the policies, rules and procedures in place at their assigned work location, including the patient safety, infection control and Professional Appearance and Dress Code policies at issue here.

22.     To comply with the Professional Appearance and Dress Code policy, avoid being sent home without pay to change clothes and escape disciplinary action for non-compliance with the Professional Appearance and Dress Code policy, Plaintiff and the collective group members took special care in cleaning and ironing their uniforms and wore a clean, wrinkle-free uniform to work each day.

23.     Despite the high importance Defendant placed on ensuring that Plaintiff and the collective group members showed up for work in a clean, wrinkle-free uniform, they did not provide Plaintiff and the collective group members with access to washing, drying or ironing facilities or equipment during work hours or at the job site.  Defendant also did not provide an in-house laundry service or contract with an outside vendor to clean and iron employee uniforms.

24.     As a result, Plaintiff and the collective group members had to spend several "off-the-clock" hours away from work each week to properly maintain their uniforms.  Had Defendant not required Plaintiff and the collective group members to show up for work each day in a clean, wrinkle-free uniform, they could have used their time away from work as they chose, for pursuits either inside or outside the house without being regularly interrupted to tend to, or spend time on, uniform-related activities.

### D. Defendant Knew That the Collective Group Members Spent Time Washing and Ironing Their Uniforms to Comply with the Professional Appearance and Dress Code Policy.

25. Defendant knew that Plaintiff and the collective group members routinely spent more than a *de minimis* amount of "off-the-clock" time cleaning and ironing their uniforms because they were aware of the patient safety, infection control and Professional Appearance and Dress Code policies at issue here.

26. Defendant knew that Plaintiff and the collective group members routinely spent more than a *de minimis* amount of "off-the-clock" time cleaning and ironing their uniforms because Defendant's supervisors saw Plaintiff and the collective group members coming in to work on a regular basis wearing clean, wrinkle-free uniforms.

27. Defendant knew that Plaintiff and the collective group members routinely spent more than a *de minimis* amount of "off-the-clock" time cleaning and ironing their uniforms because they were aware that these workers did not have access to laundry or ironing facilities or equipment during work hours or at their job sites.

28. Defendant knew that Plaintiff and the collective group members routinely spent more than a *de minimis* amount of "off-the-clock" time cleaning and ironing their uniforms because Defendant trained its supervisory employees to provide guidance to Plaintiff and the collective group members on the care and maintenance of their uniforms based on the Professional Appearance and Dress Code policy.

29. Defendant knew that Plaintiff and the collective group members routinely spent more than a *de minimis* amount of "off-the-clock" time cleaning and ironing their uniforms because Defendant's supervisors regularly encouraged, suffered and permitted Plaintiff and the

8

collective group members to comply with the Professional Appearance and Dress Code policy without ensuring that the time required to do so was properly tracked.

30. Defendant did not implement or enforce sufficient procedures to ensure that the time Plaintiff and the collective group members spent to comply with the Professional Appearance and Dress Code policy was properly tracked.

31. Defendant did not implement or enforce sufficient policies or procedures to ensure that Plaintiff and the collective group members were paid any wages for the time they spent complying with Defendant's Professional Appearance and Dress Code policy.

### E. Complying With Defendant's Professional Appearance and Dress Code Policy Took Between Two and Three "Off-The-Clock" Hours Per Week.

32. Plaintiff is personally familiar with, and was personally affected by, the patient safety, infection control and Professional Appearance and Dress Code policies at issue here.

33. During the relevant period, Plaintiff worked as a CNA at the Manor Care facility in Devon, Pennsylvania. Plaintiff generally worked 36-45 hours per week in 4-5 double shifts per week.

34. Plaintiff wore the required uniform of light blue scrubs for each of her assigned shifts and all extra or overtime shifts until the end of her tenure when she began wearing a required uniform of dark blue scrubs.

35. As a CNA, Plaintiff's work duties regularly included direct contact with patients, visitors and other Manor Care employees providing care in order to maintain the patients' physical and emotional wellbeing. Plaintiff's job duties included taking care of patients and ensuring their daily living needs are met; bathing patients; helping patients brush their teeth;

assisting with feeding patients; playing games with patients; taking them for walks; checking their vital signs and monitoring them for changes in their overall health and behavior.

36. At any given time during the relevant period, Plaintiff owned about eight pairs of scrubs, consisting of a top and a bottom. Plaintiff was always careful to store and wash her work uniforms separately from her other clothes for infection control.

37. On average, because of her work schedule and the nature of her work, Plaintiff had to wash, dry and iron five to eight scrub sets each week. Plaintiff typically spent about 1½ hours twice a week (i.e., three hours per week) washing her uniforms.

38. Plaintiff's uniform maintenance routine typically involved spending about 5-10 minutes collecting her scrubs, examining them for stains, pre-treating stains and placing them in the washer. Plaintiff's washer cycle ran about 18-22 minutes and her dryer cycle ran about 25-30 minutes. When Plaintiff took her uniforms out of the dryer, they were always wrinkled. To remove the wrinkles, Plaintiff took her uniforms to her bedroom and ironed them. It took her about 5-10 minutes to iron each scrub top and 7-8 minutes to iron each scrub bottom.

39. During the relevant period, Plaintiff has typically earned a straight-time rate of about $12.54 per hour and an overtime premium rate of about $18.81 per hour. Since 2010, Defendant has paid Plaintiff at an overtime rate for hours worked beyond 40 each week, but it has never paid Plaintiff any wages for any of the time she spent washing, drying, or ironing her uniforms to show up for work each day in a clean, wrinkle-free uniform as required by Defendant's Professional Appearance and Dress Code policy.

40. If Defendant had not required Plaintiff to show up for work each day in a clean, wrinkle-free uniform, she could have used her time away from work as she chose, for pursuits

either inside or outside the house without being regularly interrupted to tend to, or spend time on, uniform-related activities.

41. From her personal observation of Defendant's other employees and her interaction with those employees during the relevant period, Plaintiff believes that all other Nursing Department employees in Manor Care's skilled nursing facilities were subjected to the same Professional Appearance and Dress Code policy, routinely spent more than a *de minimis* amount of "off-the-clock" time cleaning and ironing their uniforms to comply with Defendant's Professional Appearance and Dress Code policy and that Defendant did not track this time or pay any wages for this time.

42. As a result of Defendant's conduct, Plaintiff and the collective group members have regularly been deprived of wages owed for the "off-the-clock" time they spent cleaning and ironing their uniforms to comply with Defendant's Professional Appearance and Dress Code policy.

43. As a result of their conduct, Defendant has improperly retained money it should have paid as wages to Plaintiff and the collective group members for time they spent cleaning and ironing their uniforms to comply with Defendant's Professional Appearance and Dress Code policy. By retaining this money, Defendant has received an inequitable windfall through, *inter alia*, reduced labor and operations costs and enhanced profit margins.

## **FLSA COLLECTIVE ACTION ALLEGATIONS**

44. Plaintiff brings this collective action under 29 U.S.C. §216(b) on behalf of a collective group defined to include:

> All full-time Nursing Department employees who have worked at any Manor Care skilled nursing facility since December 31, 2011 and spent more than *de minimis* "off-the-clock" time to comply with Defendants' Professional Appearance and Dress Code policy.

11

Upon information and belief, the relevant Nursing Department job classifications include: CGNAs, CNAs, GNAs, Hospitality Aides, LPNs, Nurse Aides, Restorative Aides, RNs and STNAs. Plaintiff reserves the right to amend this definition as necessary.

45. Plaintiff is a member of the collective group defined above, because she worked as a full-time Nursing Department employee for Defendant and regularly spent more than *de minimis* "off-the-clock" time to comply with Defendant's Professional Appearance and Dress Code policy.

46. Although Plaintiff and the collective group members may have worked in different facilities, or for different entities, this action may be properly maintained as an FLSA collective action because, during the relevant period because:

   (a) Defendant either directly or jointly employed all of the collective group members;

   (b) Defendant required all of the collective group members to comply with the same patient safety, infection control and Professional Appearance and Dress Code policies;

   (c) Defendant provided all of the collective group members with common training concerning the applicable patient safety, infection control and Professional Appearance and Dress Code policies;

   (d) To comply with Defendant's patient safety, infection control and Professional Appearance and Dress Code policies, Plaintiff and the collective group members were all required to show up for each shift in a clean, wrinkle-free uniform;

   (e) Plaintiff and the collective group members regularly spent more than *de minimis* "off-the-clock" time to comply with Defendant's patient safety, infection control and Professional Appearance and Dress Code policies;

   (f) Defendant did not maintain contemporaneous records of the time Plaintiff and the collective group members spent complying with Defendant's patient safety, infection control and Professional Appearance and Dress Code policies, or cause

        Plaintiff and the collective group members to maintain such records;

(g) Defendant did not pay Plaintiff and the collective group members any wages for the time they spent complying with Defendant's patient safety, infection control and Professional Appearance and Dress Code policies;

(h) Defendant maintained common timekeeping systems and policies with respect to Plaintiff and the collective group members;

(i) Defendant maintained common overtime work and pay policies with respect to Plaintiff and the collective group members;

(j) Defendant maintained common payroll systems and policies with respect to Plaintiff and the collective group members; and

(k) Defendant's labor relations and human resources systems were centrally-organized and controlled, and shared a common management team that controlled the policies at issue here.

47.    Plaintiff estimates that the collective group, including both current and ex-employees over the relevant period, will include several thousand members. The precise number of collective group members should be readily available from a review of Defendant's personnel, scheduling, time and payroll records, and from input received from the collective group members as part of the notice and "opt-in" process provided by 29 U.S.C. § 216(b).

## COUNT I
## Violation of the FLSA

48.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

49.    Defendant's annual sales exceed $500,000 and it has more than two employees, so the FLSA applies in this case on an enterprise basis. Defendant's employees engage in interstate commerce and, therefore, they are also covered by the FLSA on an individual basis.

50. Plaintiff and the collective group members, Defendant's employees, are similarly situated individuals within the meaning of the FLSA, 29 U.S.C. § 216(b).

51. 29 U.S.C. § 206 requires employers to pay their employees a minimum wage for all hours worked.

52. At all times relevant to this action, Defendant "suffered or permitted" Plaintiff to work and thus "employed" her within the meaning of the FLSA, 29 U.S.C. § 203(g).

53. 29 U.S.C. § 207(a)(1) states that an employee must be paid an overtime rate, equal to at least 1½ times the employee's regular rate of pay, for all hours worked in excess of 40 per week.

54. 29 U.S.C. § 211(c) requires employers to keep all payroll records and time records for at least three years, including all basic timecards and daily start/stop times for each employee.

55. Plaintiff and the collective group members are not exempt from the overtime pay requirements of the FLSA for any reason.

56. Throughout the relevant period, Defendant expected and required Plaintiff and the collective group members to spend more than *de minimis* "off-the-clock" time complying with the requirements of Defendant's Professional Appearance and Dress Code policy, but nevertheless failed to properly track, or pay any wages for, this time.

57. Defendant has, thus, violated the FLSA by failing to pay Plaintiff and the collective group members at the rate of one and one-half times their regular hourly rate, for all hours worked in excess of 40 per workweek.

58. Plaintiff and the collective group members have been harmed as a direct and proximate result of Defendant's unlawful conduct, because they have been deprived of wages

owed for time they spent complying with the requirements of Defendant's Professional Appearance and Dress Code policy, from which Defendant derived a direct and substantial benefit.

WHEREFORE, Plaintiff respectfully prays for an Order:

(a) Requiring Defendant to provide a list of the names, addresses, phone numbers and e-mail addresses of the collective group members;

(b) Authorizing Plaintiff's counsel to issue an approved form of notice informing the collective group members of the nature of the action and their right to join this lawsuit;

(c) Appointing David J. Cohen of Kolman Ely, P.C. and Lance C. Young and Neil B. Pioch of Sommers Schwartz, P.C. as Class Counsel;

(d) Declaring that Defendant willfully violated the applicable overtime provisions of the FLSA by failing to pay all required wages to Plaintiff and the collective group members and granting an injunction prohibiting Defendant from continuing to violate the FLSA on this basis;

(e) Granting judgment in favor of Plaintiff and the collective group members on their FLSA claim;

(f) Awarding compensatory damages to Plaintiff and the collective group members in an amount to be determined;

(g) Awarding liquidated damages to Plaintiff and the collective group members equal to their compensatory damages;

(h) Awarding all costs and a reasonable attorney's fees for the work required to prosecute this claim;

(i) Awarding any further relief the Court deems just, equitable and proper; and,

(j) Granting leave to add additional case Plaintiff by motion, the filing of written consent forms, or any other method approved by the Court.

## DEMAND FOR JURY TRIAL

Plaintiff, by and through her undersigned counsel, hereby demands a jury trial in the above-captioned matter.

Respectfully submitted,

Dated: December 3, 2014

/s/ David J. Cohen
David J. Cohen
KOLMAN ELY, P.C.
414 Hulmeville Avenue
Penndel, PA 19047
(215) 750-3134

Lance C. Young
Neil B. Pioch
SOMMERS SCHWARTZ, P.C.
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300

*Counsel for Plaintiff and the Putative Collective Group*